**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

LEGEE ADAMS                                          CIVIL ACTION NO. 15-2637

VERSUS                                               JUDGE S. MAURICE HICKS, JR.

CITY OF SHREVEPORT, ET AL.                           MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before the Court is Defendants the City of Shreveport, Officer Stacy Coleman ("Officer Coleman"), and Officer Collin Neville's ("Officer Neville") (collectively "Defendants") Motion for Partial Summary Judgment (Record Document 21) seeking dismissal of most of Plaintiff LeGee Adams' ("Adams") claims in the instant 42 U.S.C. § 1983 action. For the reasons contained in the instant Memorandum Ruling, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL AND PROCEDURAL BACKGROUND

This action arises from Adams' arrest on the night of November 6, 2014, in Shreveport, Louisiana. On that night, Officers Coleman and Neville, members of a combined Caddo Parish Sheriff's Department and Shreveport Police Department ("SPD") street-level narcotics team, were patrolling streets near the Louisiana State Fairgrounds in Shreveport. See Record Document 21-6 at 13 (deposition of Officer Neville page 42, lines 4-23). According to the officers, they were assigned to patrol this area because it is a high-crime area and because a greater officer presence is needed to patrol the area during the Louisiana State Fair, which was ongoing at the time. See Record Document 21-5 at 9 (deposition of Officer Coleman page 29, lines 10-14); see Record Document 21-6 at 13 (deposition of Officer Neville page 42, lines 12-23). The officers were patrolling in a blue Ford Crown Victoria with no exterior markings indicating that the car was a police

car. See Record Document 21-5 at 10 (deposition of Officer Coleman page 33, lines 23-24). However, the car was equipped with light bars on the interior of the windshield and a siren. See id. at 11 (deposition page 34, lines 9-18). Officer Coleman was dressed in a black long-sleeve t-shirt with the word "POLICE" written on the sleeves, a bullet-proof vest with "POLICE" written across it, a gold police badge, and a mask over his face. See id. at 9 (deposition page 32, lines 1-25).

While on patrol travelling westbound on Boone Street at about 8:30 PM, Officers Coleman and Neville observed two males walking in the street. See id. at 11 (deposition page 35, lines 8-22). The exact position of the officers and the two men is unclear, but all of the deposition testimony submitted for the instant Motion agrees that it was near the intersection of Boone Street and Prentiss Avenue. See id. at 11-12 (deposition pages 35-39); see Record Document 21-8 at 7 (deposition of Adams, page 24, lines 15-25). According to the officers, the men were walking in the middle of the street such that they impeded the flow of traffic, in violation of Shreveport City Ordinance § 90-462 (walking on or along roadways).[1] See Record Document 21-5 at 11 (deposition of Officer Coleman pages 35-43); see Record Document 21-6 at 14 (deposition of Officer Neville page 47, lines 3-6). According to Officer Coleman, one of the men (who was later identified as Adams) was also "sagging," meaning that he was wearing his pants below his waist, in violation of Shreveport City Ordinance § 50-167 (wearing of pants below the waist in public). See Record Document 21-5 at 11 (deposition of Officer Coleman pages 35-43); see Record Document 21-4 at 7 (Officer Coleman's narrative supplement to the offense

---

[1] None of the materials in the summary judgment record specifically cite this provision, but this is clearly the provision that the questioning attorneys and officers discussed in the depositions. See Record Document 21-6 at 14 (deposition of Officer Coleman page 48, lines 7-12).

report for the arrest of Adams). The officers decided to perform an investigative or <u>Terry</u> stop of the two men. <u>See</u> Record Document 21-5 at 13 (deposition of Officer Coleman page 43, lines 22-24).

The two men were Plaintiff Adams and his cousin, Aaron King ("King").[2] <u>See</u> Record Document 21-8 at 7 (deposition of Adams page 23, lines 7-21). They had just attended a party at a nearby house and were walking back to Adams' house, which is on Boone Street, when they encountered the officers. <u>See id.</u> (deposition pages 23-24). Adams suffers from a speech impediment and a learning disability. <u>See id.</u> at 3 (deposition page 8, lines 12-16).

Officer Coleman contends that Officer Neville activated the lights on the car to make the stop of Adams and King. <u>See</u> Record Document 21-5 at 13 (deposition of Officer Coleman pages 42-43). He is not sure whether Officer Neville activated the sirens. <u>See id.</u> Officer Neville is not certain whether he activated the lights and sirens of the car, but he stated that it is his habit to do so when he makes <u>Terry</u> stops. <u>See</u> Record Document 21-6 at 15 (deposition of Officer Neville pages 50-51). Lieutenant Jeffrey Peters ("Lieutenant Peters"), one of Officers Coleman and Neville's supervisors on the street-level narcotics team, was also patrolling in the area at the time in a white Chevrolet Tahoe. <u>See</u> Record Document 21-7 at 16-17 (deposition of Lieutenant Peters pages 56-61). According to Lieutenant Peters, he observed the lights of the officers' vehicle come on as he was driving south on Prentiss Avenue. <u>See id.</u> Adams contends that the officers did

---

[2] There is very little material regarding King in the summary judgment record. Apparently, even Adams does not know the whereabouts of King, so the parties were presumably unable to find King to depose him. <u>See</u> Record Document 21-8 at 13 (deposition of Adams page 48, lines 15-17).

not activate their lights or sirens at all. See Record Document 21-8 at 8 (deposition of Adams page 28, lines 18-22).

The officers emerged from their car to initiate the stop. According to Officer Coleman, Adams ran from him as soon as he began to exit the car; Officer Coleman then immediately began yelling "stop" and "police" at Adams as he chased him. See Record Document 21-5 at 13 (deposition of Officer Coleman page 44, lines 2-17). According to Adams, all he saw was a masked man emerge from the vehicle with his gun drawn, with no such warnings or announcements indicating that the man was a police officer. See Record Document 21-8 at 8 (deposition of Adams, pages 26-28). Adams admits that after taking two steps back, he then ran from the officers in fear of being shot; first, he actually ran east on Boone Street towards the officers, but then cut north on Prentiss Avenue. See id. at 9 and 14-15 (deposition page 29, lines 17-19, and pages 52-53). Adams asserts that he changed directions because the white Tahoe (driven by Lieutenant Peters) attempted to hit him as he was running. See id. According to Lieutenant Peters, Adams was looking back as he was running, and simply ran into the side of the Tahoe because he was not looking in front of him. See Record Document 21-7 at 17 (deposition of Lieutenant Peters page 61, lines 5-11).

Officer Coleman eventually caught up to Adams in a vacant lot nearby. According to Adams, after running for an uncertain distance, he stopped. See Record Document 21-8 at 9 (deposition of Adams page 30, lines 6-16). Then, he contends that Officer Coleman tackled him, punched him multiple times in the face, kicked him in the arm and ribs, hit him in the collarbone with a pair of handcuffs, and roughly pulled his arms behind his back and put them in handcuffs. See id. at 9-10 (deposition pages 31-34). Officer Coleman

contends that as he was chasing Adams, Adams began to stumble, and he grabbed Adams' shoulder as Adams was falling to the ground. <u>See</u> Record Document 21-5 at 14 (deposition of Officer Coleman pages 47-48). According to Officer Coleman, once he and Adams were on the ground, with Adams face down and Officer Coleman's chest on top of him, Officer Coleman simply pulled Adams' arms out from beneath him and handcuffed them behind his back. <u>See id.</u> Though Lieutenant Peters chased after Adams and Officer Coleman as well, he states that he did not catch up with them until Officer Coleman had already placed Adams in handcuffs and gotten Adams up from the ground. <u>See</u> Record Document 21-7 at 17-18 (deposition of Lieutenant Peters pages 61-63). The next day, doctors diagnosed Adams with a broken collarbone, hand sprain and strain, and fractured hand. <u>See</u> Record Document 21-4 at 18 (medical records from University Health).

After the arrest, Officer Coleman advised Adams of his <u>Miranda</u> rights. <u>See</u> Record Document 21-4 at 7. He then searched Adams, finding two cigars that each contained about 0.2 grams of marijuana. <u>See id.</u> According to Officer Coleman, Adams stated that he had run from the officers because he did not want to be arrested for possession of marijuana. <u>See id.</u>

Adams was later charged with possession of marijuana and resisting an officer. <u>See</u> Record Document 21-9 at 2 (certified record of court proceedings from First Judicial District Court, Caddo Parish, Louisiana). On December 16, 2014, Adams pleaded guilty to possession of marijuana, and the resisting an officer charge was dismissed. <u>See id.</u>

On November 5, 2015, Adams filed the instant 42 U.S.C. § 1983 action. In his complaint, Adams asserts both federal constitutional claims and claims under state law. <u>See</u> Record Document 1. On November 18, 2016, Defendants filed the instant Motion for

Partial Summary Judgment. <u>See</u> Record Document 21. Plaintiff Adams filed an Opposition on December 7, 2016. <u>See</u> Record Document 27. Defendants filed a reply brief on December 15, 2016. <u>See</u> Record Document 31.

## LAW AND ANALYSIS

### I.  Legal Standards

### A. The Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Also, "a party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment." Fed. R. Civ. P. 56(e)(3).

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings . . . [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine dispute of material fact exists. <u>See id.</u> at 325; <u>see</u> <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).

A non-movant, however, cannot meet the burden of proving that a genuine dispute of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d at 1075. Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.

The Court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). A court may grant summary judgment under Fed. R. Civ. P. 56(f)(3) so long as it provides the parties with "ample notice [and] time to respond" and "consider[s] everything" that the parties claim to be probative of the matters that have been identified. Santana v. Cook Co. Bd. of Review, 679 F.3d 614, 619 (7th Cir. 2012); see also Wang v. Prudential Ins. Co. of Am., 439 Fed. Appx. 359, 363 n.2 (5th Cir. 2011).

**B. Section 1983 Suits: Individual Capacity vs. Official Capacity Claims**

Section 1983 authorizes the assertion of a claim for relief against a person who, acting under the color of state law, allegedly violated the claimant's rights under federal law. See 42 U.S.C. § 1983. In § 1983 suits, government officials may be sued in either their individual or official capacities. A claim against a state or municipal official in his official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Individual or personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." Id.

## C. Qualified Immunity in Section 1983 Suits

The qualified immunity doctrine often protects public officials from liability in § 1983 actions brought against a person acting under the color of state law in his individual capacity. "The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation." Ashcroft v. Iqbal, 556 U.S. 662, 685 (2009) (internal quotations and citations omitted). In fact, a qualified immunity defense is truly "an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

Once the defendant raises a qualified immunity defense, the plaintiff carries the burden of demonstrating the inapplicability of qualified immunity. See Floyd v. City of Kenner, 351 Fed. Appx. 890, 893 (5th Cir. 2009). First, the court must determine whether the plaintiff demonstrated a genuine dispute of material fact as to a violation of a constitutional right. See Pearson, 555 U.S. at 232. Second, the court must determine whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. Id. A defendant who can validly raise a qualified immunity defense will enjoy its protection so long as the allegedly violated constitutional right was not clearly established at the time of the violation. See id. In other words, the defendant can only be held liable if he violates a right that is clearly established at the time of the violation.

## II. Analysis

In his complaint, Adams asserts the following federal constitutional claims under § 1983 against Officers Coleman and Neville: (1) false arrest; (2) excessive force; and (3)

failure to intervene. <u>See</u> Record Document 1 at 5-11. He also asserts a § 1983 <u>Monell</u> claim for maintaining an unconstitutional policy or custom against the City of Shreveport. <u>See id.</u> It is not clear from the complaint whether Adams is suing Officers Coleman and Neville in their individual or official capacities in his § 1983 claims, so the Court will assume that Adams is suing them in both capacities. Additionally, Adams asserts the following claims under state law against both Officers Coleman and Neville and the City of Shreveport: (1) excessive force; (2) assault; (3) battery; (4) false imprisonment; (5) false arrest; and (6) malicious prosecution. <u>See id.</u> at 11-27. He also asserts a negligent hiring, training, and/or supervision claim against the City of Shreveport. <u>See id.</u>

Defendants' Motion for Partial Summary Judgment asserts the defense of qualified immunity. <u>See</u> Record Document 21-1 at 11; <u>see also</u> Record Document 5 at ¶ 128 (Defendants' Amended Answer asserting qualified immunity as an affirmative defense). The Motion also argues that there is no genuine dispute of material fact many of Adam's claims, though the Motion concedes that there is such a dispute as to Adams' excessive force claims against Officer Coleman. <u>See</u> Record Document 21-1 at 11.

### A. Adams' Official Capacity Claims against Officers Coleman and Neville

Adams' complaint does not state whether he is seeking relief under § 1983 against Officers Coleman and Neville in their official or individual capacities. <u>See</u> Record Document 1. Thus, the Court must assume that he seeks relief against them in both capacities.

Adams cannot obtain relief against these officers in their official capacities for two reasons. First, because a suit against a public official in his official capacity is simply a suit against the local governmental entity itself, the proper official to sue in his official

capacity to impose liability upon a local governmental entity is the official with final policymaking authority for the entity under state or local law. See Burge v. Parish of St. Tammany, 187 F.3d 452, 468-70 (5th Cir. 1999), citing, *inter alia*, St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion). Under the undisputed facts in the summary judgment record, Officers Coleman and Neville are both corporals in the SPD, a rank one rank above the rank of an ordinary officer. See Record Documents 21-5 at 8 (deposition of Officer Coleman page 25, lines 9-12) and 21-6 at 10 (deposition of Officer Neville page 32, lines 4-7). Therefore, these officers are unquestionably not the final policymaking authorities for the SPD, and as such are not the appropriate officials to sue in their official capacity to impose liability on the City of Shreveport.

Second, municipal entities cannot be held liable under a theory of respondeat superior, but rather can only be held liable for an unconstitutional policy or custom that causes the deprivation of the plaintiff's constitutional rights under the framework set forth in Monell v. Dept. of Social Serv., 436 U.S. 658 (1978). Thus, any claims against these officers, even if they were the correct officers to sue as the final policymaking authorities for the SPD, would be subsumed into Adams' Monell claim against the City of Shreveport, which is discussed in Section II, D, *infra*. For these two reasons, all of Adams' official capacity claims against Officers Coleman and Neville must be dismissed. Therefore, the Court will only analyze Adams' § 1983 claims against Officers Coleman and Neville for false arrest, excessive force, and failure to intervene as individual capacity claims.

**B. Adams' Section 1983 False Arrest Claims**

Adams asserts a false arrest claim against Officers Coleman and Neville. See Record Document 1 at 5-6. The parties' arguments in the Motion for Partial Summary

Judgment primarily focus on whether Adams' false arrest claim is barred as a result of his conviction for possession of marijuana. See Record Document 21-1 at 4-6, citing Heck v. Humphrey, 512 U.S. 477, 486-87 (1994) ("to recover damages for allegedly unconstitutional conviction or imprisonment . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed . . . expunged . . . declared invalid . . . or called into question"); see Record Document 27-1 at 7-8. However, Officers Coleman and Neville have also asserted the affirmative defense of qualified immunity. See Record Document 21-1 at 11; see also Record Document 5 at ¶ 128 (Defendants' Amended Answer asserting qualified immunity as an affirmative defense). Because the Court finds that under a qualified immunity analysis and the summary judgment evidence Officers Coleman and Neville at least arguably had probable cause to arrest Adams, Adams' § 1983 false arrest claim may be dismissed without addressing the Heck bar. See Pearson, 555 U.S. at 232 (the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation").

The Fourth Amendment to the United States Constitution states that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment applies to the States through the Fourteenth Amendment's Due Process Clause. See Mapp v. Ohio, 367 U.S. 643 (1961). The existence of probable cause is a prerequisite to any constitutional arrest, which is a "seizure" of a person under the Fourth Amendment. See Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). "Probable cause" is defined as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent

person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id.

Because probable cause is a requirement for a constitutional arrest, one element that a plaintiff in a false arrest claim under § 1983 must prove is that there was no probable cause for his or her arrest. See Club Retro, LLC v. Hilton, 568 F.3d 181, 204 (5th Cir. 2009). When an officer asserts the defense of qualified immunity on such a claim, "there must not even arguably be probable cause for the search and arrest for immunity to be lost" because "qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Brown v. Lyford, 243 F.3d 185, 190 (5th Cir. 2001) (internal quotations omitted). "The facts [constituting the basis for probable cause] must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest." Club Retro, LLC, 568 F.3d at 204. Thus, in evaluating a false arrest claim in which the defendant has asserted a qualified immunity defense at the summary judgment stage, the Court must assess the summary judgment evidence and determine whether "a reasonable officer could have concluded that there was probable cause upon the facts then available to him." Brown, 243 F.3d at 190; see Saucier v. Katz, 533 U.S. 194, 205 (2001) (under the second or "clearly established" prong of the qualified immunity analysis, "if the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the [qualified] immunity defense"). The burden of overcoming a defendant's assertion of qualified immunity rests with the plaintiff. See Floyd, 351 Fed. Appx. at 893.

In the instant action, the facts available to Officers Coleman and Neville at least arguably provided them with probable cause to arrest Adams for either impeding the flow

of traffic or "sagging." The summary judgment evidence shows that Boone Street, the street on which Adams was walking, does not have sidewalks. <u>See</u> Record Documents 21-5 at 12 (deposition of Officer Coleman page 38, lines 3-5) and 21-8 at 8 (deposition of Adams page 25, lines 3-4). Shreveport City Ordinance § 90-462 (walking on or along roadways) provides that "where sidewalks are not provided, any pedestrian walking along and upon a street or highway shall, when practicable, walk only on the left side of the roadway, or its shoulder, facing traffic which may approach from the opposite direction." According to both officers, Adams and King were walking in the middle of the street when the officers came upon them. <u>See</u> Record Document 21-5 at 11 (deposition of Officer Coleman pages 35-43); <u>see</u> Record Document 21-6 at 14 (deposition of Officer Neville page 47, lines 3-6). Adams stated that he was walking on the right side of the road as he was walking westbound on Boone Street. <u>See</u> Record Document 21-8 at 8 (deposition of Adams page 25, lines 14-15) ("I was walking . . . on my right side because I always walk on my right side"). Thus, even under Adams' version of events, the officers at least arguably had probable cause to arrest Adams for a violation of this ordinance, as the ordinance required Adams to walk on the opposite side of the street from the side on which he contends he was walking.

Shreveport City Ordinance § 50-167 (wearing of pants below the waist in public) provides that "it shall be unlawful for any person to appear in public wearing pants below the waist which expose the skin or undergarments." Officer Neville did not recall seeing anything unusual about Adams' or King's pants on the night in question. <u>See</u> Record Document 21-6 at 14 (deposition of Officer Neville pages 48, lines 24-25, and 49, line 1). However, Officer Coleman stated that he noticed that one of the men, who was later

determined to be Adams, was sagging. <u>See</u> Record Document 21-5 at 12 (deposition of Officer Coleman pages 40-41). One important portion of Officer Coleman's deposition testimony on this point is as follows:

> Q:  How could you tell that the individual's pants were below his waist?
> A:  Because you could see his–you could see his pants. Like, they were, like, really low. I mean, the bottoms were, like, bunched up. And, like I say, his–I couldn't tell if he had on a belt or not, but they were definitely below his waist.

<u>Id.</u> (deposition pages 40, lines 23-25, and 41, lines 1-4).

Adams points out that "curiously," he was not charged with either sagging or impeding the flow of traffic, but rather was charged with the more serious offenses of resisting arrest and possession of marijuana. Record Document 27-1 at 8. Thus, Adams contends that this shows that he was arrested without probable cause because the officers only developed probable cause to arrest him for any offense once they found marijuana on Adams during a search incident to his arrest. <u>See id.</u> ("In essence, Plaintiff argues that probable cause was lacking until the search incident to arrest occurred"). However, as stated above, the Court finds that Officers Coleman and Neville at least arguably had probable cause to arrest Adams for either impeding the flow of traffic or "sagging." The fact that Adams was only charged with resisting arrest and possession of marijuana does not mean that the officers lacked probable cause for the arrest. <u>See</u> <u>Club Retro, LLC</u>, 568 F.3d at 204 ("we will find that probable cause existed if the officer was aware of facts justifying a reasonable belief that an offense was being committed, whether or not the officer charged the arrestee with that specific offense").

The Court must also address two other arguments[3] that Adams makes in the context of his state law claims of false arrest and false imprisonment because these arguments attempt to show that the officers did not have probable cause to arrest Adams. Adams argues that the city ordinances that make improperly walking on or along roadways/impeding the flow of traffic and "sagging" crimes do not provide officers with the authority to arrest those who have allegedly violated the ordinances. See Record Document 27-1 at 24-27. Rather, they merely permit issuance of a citation. See id. Additionally, Adams cites numerous cases in support of the argument that merely running from an officer does not constitute "resisting" under La. R.S. § 14:108 if an officer is not engaged in attempting to seize property, serve process, or make an arrest. See id., citing, inter alia, State v. Nix, 406 So. 2d 1355 (La. 1981). Thus, according to Adams, the Defendant officers could not have had probable cause to arrest Adams for resisting arrest because at the time that they stopped Adams, they merely wished to conduct a Terry stop and were not attempting to seize property, serve process, or make an arrest. See id.

Even if these arguments are correct under state law, they do not affect his § 1983 claim for false arrest. As to the first argument, though the seriousness of an offense may be relevant to a false arrest claim under state law, is irrelevant to a § 1983 claim for false arrest under the Fourth Amendment. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). No violation of the arrestee's Fourth Amendment rights occurs even if state or local law provides that an officer may not arrest individuals for a

_____

[3] These arguments are discussed in more detail in Section II, F, ii, infra, in which the Court addresses Adams' state law claims for false arrest and false imprisonment.

violation of the crime in question. See Virginia v. Moore, 553 U.S. 164, 174 (2008) (a "State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options [but] . . . its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional").

As to the second argument, even assuming that the officers did not have probable cause to arrest Adams for resisting arrest, they nonetheless at least arguably had probable cause to arrest Adams for the walking on or along roadways and "sagging" violations. See Atwater, 532 U.S. at 354. The case is particularly strong for the walking on or along roadways violation because even if Adams' own description of where he was walking is taken as true, he was violating the walking on or along roadways ordinance. See Record Document 21-8 at 8 (deposition of Adams page 25, lines 14-15) ("I was walking . . . on my right side because I always walk on my right side"). Therefore, the Court finds that all of Adams' attempts to defeat the officers' assertion of qualified immunity on the § 1983 false arrest claim are unavailing, and the claim must therefore be dismissed against both officers.

### C. Adams' Section 1983 Excessive Force Claims

Adams asserts excessive force claims against Officers Coleman and Neville. See Record Document 1 at 6-8. Defendants' Motion for Partial Summary Judgment concedes that there is a genuine dispute of material fact as to Adams' § 1983 excessive force claim against Officer Coleman, but asserts that there is no genuine dispute of material fact on this claim as to Officer Neville. See Record Document 21-1 at 7.

The right of a person to be free from the use of excessive force during a seizure of his person, like the right to be free from unreasonable seizures themselves, also derives

from the Fourth Amendment. See Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012). This right is a clearly established right for the purposes of a qualified immunity analysis. See id. Deciding whether an officer violated this clearly established right such that he is not entitled to qualified immunity protection requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989).

The analysis of these facts and circumstances "must be objective: To make out a Fourth Amendment violation, let alone one that violates clearly established law, the question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Poole, 691 F.3d at 628 (internal quotations omitted). An officer's use of force must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. Thus, the elements that a plaintiff must establish to overcome an officer's claim of qualified immunity in an excessive force claim are: "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable" under the objective standard used for evaluating officers' use of force. Poole, 691 U.S. at 628.

Defendants' Motion for Partial Summary Judgment asserts that there is no genuine dispute as to whether Officer Neville used excessive force against Adams because Adams' own deposition testimony states that only one officer chased him when he ran. See Record Document 21-1 at 7; see Record Document 21-8 at 10 (deposition of Adams

pages 35-36). Additionally, Officer Neville stated that when Adams ran, he detained King until Officer Coleman returned with Adams after chasing and handcuffing him. <u>See</u> Record Document 21-6 at 16 (deposition of Officer Neville pages 54-57).

Adams' Opposition to Defendants' Motion attempts to demonstrate a factual dispute as to whether Officer Neville used excessive force against Adams. <u>See</u> Record Document 27-1 at 8-12. However, this section of Adams' Opposition only mentions Officer Neville in making the conclusory assertion that summary judgment is inappropriate on Adams' excessive force claim against Officer Neville. <u>See id.</u> Otherwise, this section only recites the facts of the incident in question, emphasizes Officer Coleman's actions and Adams' injuries, and recites the standards for overcoming a qualified immunity defense on an excessive force claim. <u>See id.</u> In fact, Adams' Opposition confirms that it was Officer Coleman and not Officer Neville who ran after Adams and allegedly tackled and beat him. <u>See id.</u> at 10 ("Plaintiff ran for a short distance before being tackled and beaten by Defendant Coleman"). Finally, in another section of Adams' Opposition, Adams concedes that "Officer Neville, himself, did not tackle and batter Plaintiff." <u>See id.</u> at 13.

This showing does not meet Adams' summary judgment burden of going beyond the pleadings and designating specific facts that prove that a genuine dispute of material fact exists as to whether Officer Neville used excessive force against Adams. <u>See</u> <u>Celotex</u>, 477 U.S. at 325. The undisputed summary judgment evidence shows that only Officer Coleman, not Officer Neville, used any physical force against Adams. Therefore, Adams' § 1983 excessive force claim against Officer Neville must be dismissed.

### D. Adams' Section 1983 Failure to Intervene/Bystander Liability Claims

Adams also asserts claims against Officers Coleman and Neville for allegedly failing to intervene to prevent the deprivation of his right to be free from the use of excessive force. See Record Document 1 at 8-11. Several federal circuit courts, including the Fifth Circuit, have concluded that an officer may be liable under § 1983 when he is present at the scene of a constitutional violation by another officer and "does not take reasonable measures to protect" a person from the other officer's violation of the person's constitutional rights. Whitley v. Hanna, 726 F.3d 631, 646 (5th Cir. 2013); see also Hale v. Townley, 45 F.3d 914 (5th Cir. 1994); Sanchez v. City of Chicago, 700 F. 3d 919, 926 (7th Cir. 2012); Stevenson v. City of Seat Pleasant, 743 F.3d 411, 416-19 (4th Cir. 2014). This theory of liability against officers "most often applies in the context of excessive force claims, [but] other constitutional violations also may support a theory of bystander liability." Whitley, 726 F.3d at 646 n.11.

Generally, to prevail on a failure to intervene/bystander liability claim against an officer, the plaintiff must prove that the defendant officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) is present at the scene of the constitutional violation; (3) has a reasonable opportunity to prevent the harm; and (4) chooses not to act. Whitley, 726 F.3d at 646. When the alleged constitutional violation by the other officer is excessive force, important considerations in deciding whether these elements are met are whether the defendant officer (1) observed the use of the alleged excessive force or (2) had sufficient time to prevent the use of excessive force. See Tufaro v. City of New Orleans, 2004 U.S. Dist. LEXIS 17146 at *12 n.20 (E.D. La. 2004), citing Lanigan v. Vill. of E. Hazel Crest, 110 F.3d 467, 477 (7th Cir. 1997).

### i.  Adams' Failure to Intervene Claim against Officer Coleman

As discussed in Section II, D, *supra*, the undisputed summary judgment evidence confirms that it was only Officer Coleman who actually used force against Adams. As such, a claim against Officer Coleman–the officer who actually used force–for failure to intervene is simply illogical and cannot proceed; such a claim cannot meet the required element that there be some other officer than the defendant officer that allegedly used excessive force. See Whitley, 726 F.3d at 646. The parties implicitly recognize this fact, as their arguments focus on the failure to intervene claim against Officer Neville. See Record Documents 21-1 at 8 and 27-1 at 12-13. Thus, Adams' failure to intervene claim against Officer Coleman must be dismissed.

### ii.  Adams' Failure to Intervene Claim against Officer Neville

Adams' § 1983 failure to intervene claim against Officer Neville must also be dismissed because there is no genuine dispute of material fact as to at least two necessary elements of such a claim. Specifically, Adams has not demonstrated a genuine dispute of material fact as to whether Officer Neville (1) knew that Officer Coleman was violating Adams' constitutional rights or (2) had a reasonable opportunity to prevent the harm that Adams suffered. See Whitley, 726 F.3d at 646.

Officer Neville stated in his deposition that when Adams ran, he detained King until Officer Coleman returned with Adams after chasing and handcuffing him. See Record Document 21-6 at 16 (deposition of Officer Neville pages 54-57). After handcuffing King, Officer Neville patted him down to search for weapons, sat him on the hood of his police car, identified him, and ran an outstanding warrant check on his name and date of birth. See id. Apparently, during this time, a man also emerged from a recreational vehicle

parked in the yard of one of the nearby houses and offered Officer Neville some water. See id. at 17 (deposition page 59, lines 6-18).

In response to several questions regarding Officer Neville's ability to see or hear anything regarding Officer Coleman's chase and arrest of Adams, Officer Neville stated that once Adams and Officer Coleman turned north off of Boone Street and onto Prentiss Avenue, he could not see them or hear them. See id. at 16-17 (deposition page 57, lines 1-8, and deposition page 59, lines 1-16). Lieutenant Peters, who arrived at the vacant lot where Officer Coleman was arresting Adams just after Officer Coleman had handcuffed Adams, confirmed that "you couldn't see real well" in the vacant lot, and that he heard no sounds at all from either Officer Coleman or Adams when he encountered them. Record Document 21-7 at 18 (deposition of Lieutenant Peters page 62 lines 6-25 and page 63 lines 1-13). Adams himself confirmed that at the time of this incident, "it was really dark . . . and you really can't . . . see . . . in the dark." Record Document 21-8 at 9 (deposition of Adams page 29, lines 2-5).

Adams' Opposition to the Motion for Partial Summary Judgment primarily relies on the proximity of Officer Neville's location to the vacant lot where Officer Coleman arrested Adams to attempt to demonstrate a genuine dispute of material fact on his failure to intervene claim against Officer Neville. See Record Document 27-1 at 13. Adams argues that because Officer Neville was "mere feet from the use of excessive force" by Officer Coleman, there is a genuine dispute of material fact as to whether Officer Neville failed to intervene. Id. Lieutenant Peters stated that the location of the arrest "probably wasn't fifty feet" from the spot where the officers initially made contact with Adams and King. Record Document 21-7 at 18 (deposition of Lieutenant Peters page 62, lines 8-9).

Presence at the scene of the alleged constitutional violation is, in fact, one of the elements necessary for a claim for failure to intervene under § 1983, and proximity to the scene is relevant to determining whether the other elements are met as well. See Whitley, 726 F.3d at 646. However, under the undisputed summary judgment evidence set forth above, even though Officer Neville was close to the scene of Adams' arrest, there is no genuine dispute of material fact as to whether he (1) knew that Officer Coleman was violating Adams' constitutional rights or (2) had a reasonable opportunity to prevent the harm that Adams suffered. See id. As stated above, all summary judgment evidence indicates that it was dark outside and difficult to see at the time of this incident. Both Officers Neville and Peters testified that they heard no noises coming from the scene of the arrest in the vacant lot. Thus, there is no genuine dispute of material fact as to whether Officer Neville knew that Officer Coleman was violating Adams' rights.

Even if Officer Neville had known that Officer Coleman was violating Adams' rights, there is no genuine dispute of material fact as to whether Officer Neville had a reasonable opportunity to prevent the harm that Adams suffered. The undisputed summary judgment evidence shows that Officer Neville was preoccupied with detaining King, looking up his name for outstanding warrants, and speaking to the local resident who offered him water while Officer Coleman was chasing Adams and arresting him. Because there is no genuine dispute of material fact on two necessary elements of Adams' failure to intervene claim against Officer Neville, this claim must be dismissed.

### E. Adams' Section 1983 Monell Claims

In addition to his claims against Officers Coleman and Neville in their individual capacities, Adams also seeks relief against the City of Shreveport for its allegedly

unconstitutional policies or practices. See Record Document 1 at 11-13. This claim is based upon two separate theories: (1) that the SPD generally lacks sufficient training in the use of force and has a policy or practice of condoning the use of excessive force against all detainees and arrestees; and (2) that the SPD lacks sufficient training in the specific area of responding to emotionally disturbed persons ("EDP's"). See id.; see also Record Document 27-1 at 13-24.

In Monell v. Dept. of Social Serv., 436 U.S. 658 (1978), the Supreme Court held that municipalities and local government agencies cannot be held liable for constitutional torts under § 1983 under a theory of respondeat superior, id., 436 U.S. at 691, but they can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id., 436 U.S. at 694. In other words, merely establishing a constitutional violation by an employee of a local government entity is not enough to impose liability upon that entity under § 1983.

Rather, to succeed on a Monell claim against a local government entity, the plaintiff must establish (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. McGregory v. City of Jackson, 335 Fed. Appx. 446, 448 (5th Cir. 2009), citing Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 247-49 (5th Cir. 2003). Locating an official "policy" or "custom" ensures that a local government entity will be held liable only for violations of constitutional rights that resulted from the decisions of those officials whose acts may fairly be said to be those of the government entity itself. Bryan Cty. Comm'rs v. Brown, 520 U.S. 397 (1997).

An "official policy" may be established in one of three ways: (1) "when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy," Id., 520 U.S. at 417 (Souter, J., dissenting); (2) "where no rule has been announced as 'policy' but federal law has been violated by an act of the policymaker itself," Id., 520 U.S. at 417-18 (Souter, J., dissenting); and (3) "even where the policymaker has failed to act affirmatively at all, so long as the need to take some action to control the agents of the government 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the need.'" Id. 520 U.S. at 419 (Souter, J., dissenting) (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)).

i.  **Monell Claim Regarding General Use of Force and Training in the Use of Force**

Adams' Monell claim regarding the general use of force and training in the use of force depends on the third method of proving an official policy that caused the violation of his rights, that of showing that there was a need to take actions to prevent abuses of constitutional rights that was so obvious that the failure to act constituted deliberate indifference to constitutional rights. See Record Document 27-1 at 16-20. The core of this argument is that the deposition testimony of Officers Neville, Coleman, Peters, and Johnson shows that SPD officers are generally unfamiliar with the constitutional standards for the use of force. See id. Thus, Adams argues that this unfamiliarity shows a clear need for further training in the use of force, and that the SPD's failure to do so amounts to deliberate indifference by the City of Shreveport to constitutional rights. See id. In particular, Adams asserts that the officers' descriptions of the SPD's use of force

policies indicates that they use a subjective standard for determining the appropriate amount of force to be used in arresting a person while the Fourth Amendment's standard is an objective standard. See id.

Adams is correct that the officers' recitations of the constitutional standards for the use of force at their depositions was imperfect, and that some of the statements they make could indicate that their standard for the use of force is a subjective rather than an objective standard. For example, when asked whether he agreed that the level of force used must be objectively reasonable under the circumstances, Officer Neville made some statements that seemed to imply that he follows a subjective standard for evaluating the proper level of force to use. See Record Document 21-6 at 7 (deposition of Officer Neville page 19, lines 14-25) ("It depends on the officer and the situation and who he's dealing with. Everybody is different. I'm smaller, other guys are bigger. It's different"); see id. at 8 (deposition page 22, lines 21-25, and page 23, lines 1-16) (though an officer has an obligation to report the use of unreasonable force by another officer, "it's going to be based on that person. It's got to be pretty wild out there"). Sergeant Johnson stated that there are a lot of different things that "come into what would be reasonable to that officer at that moment" when deciding the appropriate amount of force to be used, similarly implying that he applies a subjective use of force standard. Record Document 27-9 at 3 (deposition of Sergeant Johnson page 19, lines 22-23).

Ultimately, however, an imperfect recitation of the objective standard required by the Constitution for the use of force by four police officers in depositions is not enough to demonstrate a genuine dispute of material fact on "deliberate indifference" to constitutional rights by the City of Shreveport. City of Canton, 489 U.S. at 390. Whether

an officer can perfectly recite the standards for the use of force is not the issue in a <u>Monell</u> claim; the issue is whether the municipal policymaker's failure to train in the area in question was so egregious in light of the obvious need for such training that it constituted deliberate indifference to constitutional rights. <u>See id.</u> at 390-91. Adams' Opposition cites no authority to the contrary. <u>See</u> Record Document 27-1 at 16-20.

The "deliberate indifference" standard requires "more than mere negligence." <u>Sanders-Burns v. City of Plano</u>, 594 F.3d 366, 381 (5th Cir. 2010). It is a "stringent standard of fault," and "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011). Discussing this stringent standard, the Supreme Court stated that:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

<u>Id.</u> at 390-91 (internal citations omitted).

Applying these principles to the facts of the instant action, there is no genuine dispute of material fact as to whether the City of Shreveport was deliberately indifferent to constitutional rights by providing inadequate training in the use of force. The SPD's General Order regarding the use of force specifically states that it is the policy of the SPD

for its officers to only use the level of force that is "'objectively reasonable' in light of the facts and circumstances confronting them." Record Document 21-4 at 61. All four officers testified that they were trained under this standard in the academy, have received annual retraining each year, and receive all updates to the policies and procedures of the SPD when such updates are made. See Record Documents 21-5 at 5-6 (deposition of Officer Coleman pages 12-17), 21-6 at 5-6 (deposition of Officer Neville pages 12-16), 21-7 at 6-8 (deposition of Lieutenant Peters page 16, lines 12-24, pages 18-22), and 27-9 at 6 (deposition of Sergeant Johnson pages 30-33).

Additionally, though some officers' comments could be construed to suggest that they follow a subjective standard for the use of force, other facts suggest that they follow an objective standard. See, e.g., Record Document 21-5 at 6 (deposition of Officer Coleman page 17, lines 8-11) (Officer Coleman agrees that "the use of force is determined by what is objectively reasonable in light of facts and circumstances confronting the officer at the time"). Also, Officer Neville's statements regarding the use of force could be read as an attempt to explain that though the standard is objective, the test must also take into account the knowledge of the circumstances available to the officer at the time of the use of force. See Record Document 21-6 at 7 (deposition of Officer Neville page 20, lines 2-4) ("It depends on who you are approaching, how big he is, what type of situation you're dealing with, what kind of call it is"); see Graham, 490 U.S. at 396-97 (reasonableness of the use of force is judged from the perspective of a reasonable officer "on the scene," who is often "forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation"). Finally, "claims of inadequate training generally [though not always] require that the plaintiff demonstrate

a pattern of conduct." <u>Sanders-Burns</u>, 594 F.3d at 382. Adams has not submitted any evidence of other similar incidents that could put the City of Shreveport on notice that more training is needed for its officers in the area of the use of force.

Thus, at most Adams has shown that SPD officers are unable to provide perfect recitations of the objective "reasonableness" standard for the use of force. However, other undisputed summary judgment evidence shows that the SPD maintains an objective "reasonableness" standard for the use of force, trains its officers in the application of this standard in its basic training course, and annually updates its officers' training. Based on this evidence, the Court finds that there is no genuine dispute of material fact as to whether the City of Shreveport was deliberately indifferent to constitutional rights by failing to provide adequate training in the general use of force in affecting investigative detentions and arrests. No trier of fact could reasonably conclude from the summary judgment evidence that Adams has shown deliberate indifference by the City of Shreveport to constitutional rights, a "stringent standard of fault." <u>Connick</u>, 563 U.S. at 61.

In addition to this primary argument, Adams also argues that the City of Shreveport "inadequately supervised, controlled, disciplined, and continued to employ officers who had dangerous propensities for using excessive force against citizens." Record Document 27-1 at 20. Adams bases this argument on two statements from the summary judgment record: (1) Officer Neville's statement that the narcotics team of which he and Officer Coleman were members was known as the "Jump-Out Boys" because it was known for riding through neighborhoods "looking for drugs and stuff, burglars;" and (2) Officer Neville's statement that he had been placed on administrative leave for an arrest for battery by the Bossier Parish Sheriff's Department, an incident that prompted no internal

investigation by the SPD. Id., citing Record Document 21-6 at 9 and 11 (deposition of Officer Neville pages 27, lines 5-10, and pages 35-36).

The Court finds that these two facts do not demonstrate a genuine dispute of material fact on Adams' Monell claim against the City of Shreveport. The full context of Officer Neville's deposition comments regarding the nickname the "Jump-Out Boys" is reproduced below:

> Q:  In your training, have you been trained to speak to a subject first before using physical contact?
> A:  Yes.
> Q:  Is that always possible?
> A:  No.
> Q:  What are some factors that make that impossible in certain situations?
> A:  The person. The cars we ride in, everybody knows who we are. Over in our narcotics unit, we have a nickname called "The Jump-Out Boys." That's the car they automatically assume something (sic) and they take off running. Oh, they know exactly what we do, looking for drugs and stuff, burglars.
> Q:  I'm sorry. What was the last thing?
> A:  And burglars and stuff like that. They used to send us to crime areas in trying to stop stuff like that.
> Q:  Can you explain to me where the nickname "Jump-Out Boys" came from?
> A:  It just means undercover. It's all over the whole U.S. Everybody uses it in a different way. But they gave it to us probably back in –I don't know when this started–80's or something.

Record Document 21-6 at 9 (deposition of Officer Neville page 26, lines 23-25 and page 27, lines 1-19).

Merely tolerating the use of the nickname the "Jump-Out Boys" for the street-level narcotics unit, even assuming that the ultimate policymaker for the SPD knew of the use of the nickname for this unit, is not sufficient to constitute deliberate indifference to constitutional rights. Taken alone, this nickname *may* suggest a practice of stopping persons without reasonable suspicion, but it equally suggests an entirely lawful practice,

that of repeatedly "jumping out" of an unmarked vehicle to perform <u>Terry</u> stops in the high-crime areas that the narcotics unit typically patrols. <u>See, e.g.,</u> Record Document 21-5 (deposition of Officer Coleman page 26, lines 16-21) ("we pretty much go to the troubled areas and so forth and just ride around and enforce the laws"). The only evidence in the summary judgment record related to this nickname comes from the officers themselves, and this evidence suggests that the nickname is based upon the latter understanding of the nickname. Additionally, read in context, Officer Neville clearly made the statements about the nickname in an attempt to explain why it may not always be possible to first make verbal contact with a suspect before making physical contact with him. Thus, the Court finds the failure of the SPD to do something in reaction to the use of such a nickname to protect constitutional rights, without more, does not rise to the level of "deliberate indifference" that is needed to show a genuine dispute of material fact on a <u>Monell</u> claim against the City of Shreveport. <u>City of Canton</u>, 489 U.S. at 390.

With respect to Officer Neville's period of administrative leave for an arrest for battery, this cannot constitute a basis for a <u>Monell</u> claim for several reasons. First, as discussed in Section II, C, *supra*, the undisputed summary judgment evidence shows that it was Officer Coleman, not Officer Neville, who actually used force against Adams. Thus, there could be no causal connection between the SPD's failure to take actions against Officer Neville for his alleged "dangerous propensities" and the incident at issue here. Record Document 27-1 at 20. <u>See</u> <u>City of Canton</u>, 489 U.S. at 389 (in a <u>Monell</u> claim, the plaintiff must show that the policy or custom in question was the "moving force behind the constitutional violation" the plaintiff is alleging).

Second, and more importantly, there can be no causal connection between the SPD's failure to take actions against Officer Neville for this alleged battery because his arrest for this charge occurred *after* the events that are the subject of the instant action. These events occurred on November 6, 2014, while Officer Neville's arrest for battery and period of administrative leave occurred in September of 2015. See Record Document 21-6 at 11 (deposition of Officer Neville pages 35-36). Thus, the SPD's failure to do anything about this charge, even if it could constitute deliberate indifference, simply could not be causally connected to the events at issue in the instant action. As such, the Court finds that Adams' Monell claim based on the SPD's failure to do anything about the so-called "Jump-Out Boys" or Officer Neville's arrest for battery must be dismissed.

### ii. Monell Claim Regarding Use of Force against EDP's

The second major argument Adams makes in support of his Monell claim is that the City of Shreveport was deliberately indifferent to constitutional rights by failing to provide its officers with any training regarding the use of force against EDP's. See Record Document 27-1 at 20-24. As stated in Section II, E, i, *supra*, "claims of inadequate training generally require that the plaintiff demonstrate a pattern of conduct." Sanders-Burns, 594 F.3d at 382. The exception to this rule, termed "single-incident" liability, derives from dicta in City of Canton. See Connick v. Thompson, 563 U.S. 51, 60-72 (2012) (extensively discussing single-incident liability under this dicta from City of Canton). This dicta stated that a single constitutional violation by a state actor who has not been trained regarding the law in that particular area might justify a Monell claim, even without proof of a pre-existing pattern of violations to put the local government on notice of the need for training or supervision in that area. See City of Canton, 489 U.S. at 390 n.10. Such liability would

only be available when constitutional violations would be the "highly predictable consequence" of the failure to train in that particular area. Connick, 563 U.S. at 63-64. The specific scenario the Court in Canton envisioned was one in which a city failed to train its police officers on the constitutional requirements for the use of deadly force, particularly when attempting to arrest fleeing felons. See Canton, 489 U.S. at 390 n.10.

Adams relies primarily upon this dicta from City of Canton and a Tenth Circuit case interpreting and applying this dicta, Allen v. Muskogee, 119 F.3d 837 (10th Cir. 1997), for his argument regarding the SPD's lack of training in dealing with EDP's. See Record Document 27-1 at 20-24. In Allen, the decedent (Allen) had an altercation with his wife and children and left his home. See 119 F.3d at 839. He took ammunition and several guns with him and drove to his sister's home, where he parked his car and remained inside of it. See id. Police officers responded to the report of the incident. See id. At the time that they responded, they were aware that: (1) Allen had just had an altercation with his family; (2) Allen was armed and had threatened family members; (3) Allen had an outstanding arrest warrant for impersonating an officer; and (4) Allen had called from his sister's house and threatened suicide. See id. When officers arrived on the scene, Allen was in his vehicle with a gun in his right hand. See id. Officers ordered him to drop his gun, but he did not comply. See id. Officers then approached the vehicle and attempted to disarm Allen. See id. They were unable to do so before Allen swung his gun at one of the officers. See id. The officers then opened fire, killing Allen. See id.

Allen's wife filed a § 1983 action against the police officers and the City of Muskogee, alleging both excessive force by the officers and a Monell claim against the City for failure to adequately train its officers in dealing with EDP's. See id. The Monell

claim depended upon the single-incident liability exception to the rule that such claims require proof of prior similar incidents. See id. at 845. The district court granted summary judgment for both the officers and the City, but the Tenth Circuit reversed, finding that a genuine dispute of material fact existed on both claims. See id.

On the Monell claim, the plaintiff had presented expert testimony that the City of Muskogee's failure to train its officers in properly dealing with EDP's constituted deliberate indifference to constitutional rights. See id. at 842. The plaintiff's expert, a former police officer and college professor who had become a consultant on police matters, had testified that "the officers' actions were reckless and totally contrary to proper police practices for dealing with armed mentally ill or emotionally upset persons." Id. According to him, all authorities on police tactics agreed that leaving cover and approaching an emotionally disturbed, suicidal person was likely to provoke a violent response, and was inappropriate. See id. Two of the defendants had submitted affidavits stating that they had followed their training in the incident in question; the plaintiff's expert expressed the opinion that their training was therefore inadequate. See id. at 843. The Tenth Circuit found this evidence sufficient to demonstrate a genuine dispute of material fact on all of the elements of the plaintiff's Monell claim, including (1) that the City's failure to train in this area constituted deliberate indifference and (2) that this failure caused the alleged deprivation of Allen's constitutional rights and his death. See id. at 845.

Adams uses Allen and its interpretation of single-incident liability Monell claims to attempt to defeat summary judgment. See Record Document 27-1 at 20-24. Adams argues that because Officers Coleman, Neville, Johnson, and Peters all confirmed that the SPD does not train its officers specifically in the use of force against EDP's, the City

of Shreveport was deliberately indifferent to the constitutional rights of EDP's like Adams, who suffers from a mental disability. See id.; see, e.g., Record Document 21-6 at 8 (deposition of Officer Neville, page 24 lines 8-17) (stating that he did not receive any specific training regarding interactions with mentally ill persons, either at the police academy or afterwards).

The Court finds this argument unpersuasive. First, the Court notes that Allen, a Tenth Circuit case, is not binding upon this Court. Second, one important factual distinction between the summary judgment evidence in Allen and the summary judgment evidence in the instant action is that in Allen, the plaintiff had expert testimony to support her claim. That expert testified that the training of the officers of the City of Muskogee regarding interaction with armed EDP's was inadequate and was actually directly contrary to the standard practice of most other law enforcement agencies in the country. See Allen, 119 F.3d at 842-45. Here, Adams has submitted no similar expert testimony as part of the summary judgment record.

Third, and most importantly, another factual distinction is the fact that the officers in Allen had notice that Allen was an EDP because they had been informed that Allen was armed and suicidal. See id. at 839. Because they had notice of the fact that Allen was an EDP, the plaintiff had a stronger argument that there was a genuine dispute of material fact on a causal connection between the alleged failure to train and the alleged injury. See id. at 841-42 (in an inadequate training Monell claim, plaintiff must prove that there is a "direct causal link between the constitutional deprivation and the inadequate training"); see City of Canton, 489 U.S. at 389 (in a Monell claim, the plaintiff must show

that the policy or custom in question was the "moving force behind the constitutional violation" the plaintiff is alleging).

Here, under the undisputed summary judgment evidence, there was no such notice of the fact that Adams was an EDP. The undisputed summary judgment evidence shows that Adams ran from the officers immediately, either as they were emerging from the car or within seconds of stepping out of the car. See Record Documents 21-5 at 13 (deposition of Officer Coleman page 44, lines 2-17) (stating that Adams began running as soon as the officers began to emerge from their car) and 21-8 at 8 (deposition of Adams pages 26-27) (stating that he initially briefly froze when he saw the officers open the doors to the car, but then began running once they got out and Officer Coleman started towards him). The officers had no facts indicating that Adams was an EDP; all they saw was a man who ran from them immediately. Thus, they would have no basis for using any specialized training in dealing with EDP's even if they had any training of this kind. As such, no trier of fact could reasonably conclude that a causal connection exists between the City of Shreveport's failure to train its officers in dealing with EDP's, even assuming that there was such a failure that amounted to deliberate indifference. Therefore, there is no genuine dispute of material fact on Adams' second Monell theory, and his Monell claim based on this theory must be dismissed.

**F. Adams' State Law Claims**

As noted above, Adams asserts the following causes of action under state law in addition to his § 1983 claims: (1) excessive force; (2) assault; (3) battery; (4) false imprisonment; (5) false arrest; and (6) malicious prosecution against Officers Coleman and Neville and the City of Shreveport; and (7) negligent hiring, training, and/or

supervision against the City of Shreveport. <u>See</u> Record Document 1 at 11-27. In their Motion for Partial Summary Judgment, Defendants seek summary judgment on all of Adams' state law claims except for the state law excessive force claim against Officer Coleman. <u>See</u> Record Document 21-1 at 18. However, Defendants actually only addressed Adams' false arrest, malicious prosecution, and negligent hiring, training, and/or supervision claims in the Motion. <u>See</u> Record Document 21-1 at 16-17.

### i. State Law Excessive Force, Assault, and Battery Claims

As discussed in Section II, A, *supra*, Defendants concede that a genuine dispute of material fact exists as to Adams' excessive force claims against Officer Coleman. <u>See</u> Record Document 21-1 at 18. Assault and battery claims under Louisiana law involve similar elements to excessive force claims. <u>See</u> <u>Penn v. St. Tammany Parish Sheriff's Office</u>, 843 So. 2d 1157, 1161 (La. App. 1 Cir. 04/02/2003) (excessive force elements); <u>see</u> <u>Caudle v. Betts</u>, 512 So. 2d 389 (La. 09/09/1987) (assault and battery elements). As stated, Defendants technically seek dismissal of all state law claims with the exception of the excessive force claim against Officer Coleman. <u>See</u> Record Document 21-1 at 18. However, because Defendants did not specifically address the assault and battery claims against Officer Coleman and because these claims are similar to the excessive force claim, the assault and battery claims against Officer Coleman also must survive summary judgment.

However, there is no evidence in the summary judgment record that Officer Neville ever used any force against Adams. Though Defendants did not specifically address the state law excessive force, assault, and battery claims against Officer Neville in their Motion, the Court makes the preliminary finding that based upon the summary judgment

record, there is no genuine dispute of material fact on these claims. <u>See</u> Section II, A, *supra* (discussing the lack of evidence supporting Adams' § 1983 excessive force claim against Officer Neville); <u>see</u> Fed. R. Civ. P. 56(f)(3). Adams must be given the opportunity to respond before the Court can make such a finding final and grant summary judgment on this basis. Briefing deadlines are set forth in the Conclusion section, *infra*.

### ii. State Law False Arrest and False Imprisonment Claims

Defendants seek summary judgment on Adams' state law false arrest claim on the ground that it is barred by the rule from <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994). As discussed in Section II, B, *supra*, the Court is dismissing Adams' § 1983 false arrest claim on qualified immunity grounds rather than on <u>Heck</u> grounds. That decision is based on the conclusion that because the officers at least arguably had probable cause to arrest Adams for two different crimes, the officers are protected by qualified immunity on Adams' § 1983 false arrest claim. The Court will also address whether Adams' state law false arrest and false imprisonment[4] claims are barred by qualified immunity under state law. <u>See</u> <u>Pearson</u>, 555 U.S. at 232 (the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation").

The question of whether there was a violation of state law in making the arrest is different from that of whether there was a violation of the Fourth Amendment. <u>See</u> <u>Moore</u>, 553 U.S. at 174-75. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating

---

[4] The Court will treat Adams' false arrest and false imprisonment claims similarly because the elements required for proof of these claims are similar. <u>See</u> <u>Kyle v. City of New Orleans</u>, 353 So. 2d 969, 971 (La. 12/19/1977) ("false arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority"); <u>Anderson v. Wal-Mart Stores</u>, 675 So. 2d 1184, 1186 (La. App. 5 Cir. 05/15/1996) (discussing false imprisonment under Louisiana law).

the Fourth Amendment, arrest the offender." <u>Atwater</u>, 532 U.S. at 354. States and their political subdivisions are free to provide more protections for individual rights than the United States Constitution provides, and they are free to provide their own remedies to persons whose rights under state law are violated. <u>See id.</u> (explaining that Virginia law provides more protections than the Fourth Amendment but does not generally permit the same remedies for violations of these protections, particularly the exclusion of evidence, as would be required for violations of the Fourth Amendment).

However, though whether there was a violation of state law and whether there was a violation of the Fourth Amendment are two separate questions, Louisiana's qualified immunity standards are the same as those under federal law. "Louisiana applies qualified immunity principles to state constitutional law claims based on 'the same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983'." <u>Roberts v. City of Shreveport</u>, 397 F.3d 287, 296 (5th Cir. 2005), <u>quoting</u> <u>Moresi v. State</u>, 567 So. 2d 1081, 1093 (La. 09/06/1990); <u>see also</u> <u>Knapper v. Connick</u>, 681 So. 2d 944, 946-51 (La. 10/15/1996) (applying federal absolute immunity rules to a state law claim against a prosecutor). Thus, the question for the Court is whether the officers arguably had probable cause under state law to arrest Adams; if so, qualified immunity protects them from suit under state law for false arrest or false imprisonment.

Adams argues that even if the officers had reasonable suspicion to make a <u>Terry</u> stop or probable cause to issue a citation, under state and local law they had no probable cause or authority to make an *arrest* for any of his alleged crimes, meaning that his state law false arrest and false imprisonment claims should survive summary judgment. <u>See</u>

Record Document 27-1 at 24-27. Under the facts contained in the summary judgment record, there are four crimes that Adams may have committed that could potentially justify the arrest: (1) "sagging"; (2) improperly walking on or along roadways/impeding the flow of traffic; (3) resisting arrest; and (4) possession of marijuana. The Shreveport "sagging" ordinance specifically provides that a violation of that ordinance alone "shall itself not be grounds for an arrest or for a full search of the person cited." <u>See</u> Shreveport City Ordinance § 50-167. Adams argues that a violation of the city ordinance for walking on or along roadways, like the "sagging" ordinance, merely carries penalties of "citations, fines, and possible community service," and therefore cannot constitute the basis for an *arrest* even if the officers could have issued Adams a citation for this violation. Record Document 27-1 at 24. In other words, Adams' argument with respect to the city ordinance violations adds another wrinkle to the analysis: whether, even if the officers had probable cause to issue a citation for one of the city ordinance violations, they had the *authority* under state or local law to make an arrest for such a violation.

Adams also makes a colorable argument that merely running from an officer does not constitute "resisting" under La. R.S. § 14:108 if an officer is not engaged in attempting to seize property, serve process, or make an arrest, meaning that the fact that Adams ran could not have justified the arrest either. <u>See</u> Record Document 27-1 at 24-27, <u>citing</u>, *inter alia*, <u>State v. Nix</u>, 406 So. 2d 1355 (La. 1981). Finally, because the officers unquestionably did not have probable cause for the possession of marijuana charge until after Adams' arrest and the search incident to this arrest, the possession of marijuana charge cannot justify his initial arrest. <u>See</u> Record Document 21-4 at 7 (Officer Coleman's narrative supplement stating that he only found the marijuana cigarettes in a search incident to

arrest). Thus, according to Adams, the officers actually had no probable cause or authority under state law to arrest him at all, precluding summary judgment on his state law false arrest and false imprisonment claims.

The Court finds this argument unpersuasive. The question of whether an arrest is lawful is the underlying question for a state law false arrest or false imprisonment claim. See Parker v. Town of Woodworth, 86 So. 3d 141, 144 (La. App. 3 Cir. 03/07/2012) ("In Louisiana, the tort of false arrest or imprisonment consists of two elements: (1) detention of a person; and (2) the unlawfulness of the detention"). However, as stated in Section II, B, *supra*, in the context of Adams' § 1983 false arrest claim, the key to whether the officers are protected by qualified immunity on such a claim is whether they *arguably* had probable cause to arrest him, as "qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Brown, 243 F.3d at 190. By extension, essentially the same analysis would apply with respect to Adams' argument that the officers had no authority to arrest for the city ordinance violations; the key question is whether the officers at least *arguably* had such authority. See Saucier, 533 U.S. at 205 (under the second or "clearly established" prong of the qualified immunity analysis, "if the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the [qualified] immunity defense")

Even if the Court accepted Adams' arguments on the "sagging," resisting arrest, and possession of marijuana charges, his argument would still fail as to the violation of the walking on or along roadways ordinance. Again, that ordinance states that "where sidewalks are not provided, any pedestrian walking along and upon a street or highway shall, when practicable, walk only on the left side of the roadway, or its shoulder, facing

traffic which may approach from the opposite direction." <u>See</u> Shreveport City Ordinance § 90-462. Even under Adams' description of where he was walking in the road, he was violating this ordinance, establishing at least arguable probable cause for a violation of the ordinance. <u>See</u> Record Document 21-8 at 8 (deposition of Adams page 25, lines 14-15) ("I was walking . . . on my right side because I always walk on my right side").

The question of whether the officers arguably had authority under state or local law to make an arrest for this violation is slightly more complicated, but the Court finds that the officers arguably had such authority and that their actions are therefore protected by qualified immunity. Police officers have the duty to enforce all traffic regulations in the City of Shreveport, including the walking on or along roadways ordinance. <u>See</u> Shreveport City Ordinance § 90-36 ("it shall be the duty of the officers of the police department . . . to enforce this chapter and all other traffic laws of the city"). Under Louisiana Code of Criminal Procedure Article 213(A)(1), "a peace officer may, without a warrant, arrest a person when . . . the person to be arrested has committed an offense in his presence and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit." The parties have not cited any specific regulations or ordinances regarding the authority of SPD officers to make arrests for violations of the walking on or along roadways ordinance, and the Court has not been able to find any on its own. However, under basic statutory construction principles, the apparent absence of a provision specifically prohibiting arrest for the walking on or along roadways ordinance, coupled with the presence of such a provision specifically for the "sagging" ordinance, indicates that if the City of Shreveport wished to place restrictions upon the authority of its officers to make arrests for violations of the walking on or along roadways ordinance, it would have done so. <u>See</u> <u>Green v. Bock</u>

<u>Laundry Mach. Co.</u>, 490 U.S. 504, 524-25 (1989) (general statutory rules govern in the absence of more specific statutory rules); <u>see</u> <u>United States v. Lord</u>, 2017 U.S. Dist. LEXIS 105317 at *6 (W.D. La. 2017) (when a statute includes a particular provision in one section but does not include it in another section, it may be presumed that the legislative body that drafted it intended for the provision not to apply to the section in which it was not included).

Under these rules, the Court finds that the officers at least arguably had authority to arrest Adams for violating the walking on or along roadways ordinance. Even if they did not actually have such authority under state law, their mistake, if any, was reasonable because both Louisiana law and local law generally permit arrests for even such minor violations. Therefore, qualified immunity protects them, and Adams' state law false arrest and false imprisonment claims must be dismissed. <u>See</u> <u>Saucier</u>, 533 U.S. at 205.

### iii.    State Law Malicious Prosecution Claims

Defendants seek summary judgment on Adams' malicious prosecution claims against all Defendants. <u>See</u> Record Document 21-1 at 17. To prevail on a malicious prosecution claim under Louisiana law, a plaintiff must prove: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against the plaintiff who was the defendant in the original proceeding; (3) a bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage. <u>See</u> <u>Craig v. Carter</u>, 718 So. 2d 1068, 1070 (La. App. 2 Cir. 09/23/1998). Defendants assert that there is no genuine dispute of material fact on whether there was probable cause for the criminal proceedings against Adams or a bona fide termination of the

criminal proceedings in Adams' favor. <u>See</u> Record Document 21-1 at 17. Adams did not address the Defendants' arguments on this claim in their Opposition to Defendants' Motion. <u>See</u> Record Document 27-1 at 24-28.

Adams was only prosecuted for possession of marijuana and resisting an officer, not for the violations of city ordinances for which the officers decided to make the initial stop. <u>See</u> Record Document 21-9 at 2. This makes the malicious prosecution claims distinct from the false arrest claims. At minimum, Adams cannot show a genuine dispute of material fact on his malicious prosecution claims because he cannot meet the element requiring a bona fide termination of the criminal proceedings against him. The uncontested summary judgment evidence shows that he pleaded guilty to possession of marijuana. <u>See id.</u> Because this element cannot be met, all of Adams' state law malicious prosecution claims must be dismissed.

### iv. State Law Negligent Hiring, Training, and/or Supervision Claim

Defendants seek summary judgment on Adams' negligent hiring, training, and/or supervision claim against the City of Shreveport. <u>See</u> Record Document 21-1 at 16. The elements of a negligent hiring, training, and/or supervision claim under Louisiana law, as with any negligence claim in Louisiana, are: (1) the defendant had a duty to conform its conduct to a specific standard; (2) the defendant failed to conform its conduct to that standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (in other words, the plaintiff and the plaintiff's injuries were within the scope of the defendant's duty); and (5) the plaintiff suffered damages. <u>See</u> <u>Roberts v. Benoit</u>, 605 So. 2d 1032, 1040-46 (La. 09/09/1991). Defendants assert that Adams cannot show that the

SPD's training is inadequate, meaning that Adams cannot show that the City of Shreveport breached its duty. See Record Document 21-1 at 16-17.

The "deliberate indifference" standard for a Monell claim is a more exacting standard than a negligence standard. See Sanders-Burns, 594 F.3d at 381. However, the Court's analysis of Adams' Monell claims in Section II, E, *supra*, is nonetheless relevant to the discussion of his negligent hiring, training, and/or supervision claims. As stated in that section, with respect to Adams' general use of force theory, all the summary judgment evidence shows is that the officers are unable to provide a perfect recitation of the use of force standard at a deposition. Though individual statements from the depositions could be interpreted as stating a subjective standard for the use of force, others indicate that the officers had been trained with the correct, objective standard.

Even if this were all of the summary judgment evidence related to SPD officers' training in the summary judgment record, this would not be enough to permit this claim to survive summary judgment. See Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339 (1933) ("where proven facts give equal support to each of two inconsistent inferences . . . neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover"); see Forbis v. Ignite Rest. Grp. Inc., 2017 U.S. Dist. LEXIS 53255 (W.D. La. 2017) (explaining and applying this "equal inference rule"). However, the summary judgment evidence also shows that the City provides its officers with extensive training in the proper use of force, both at the police academy and through annual retraining. Thus, the Court finds with only the meager circumstantial evidence of a lack of adequate training in the use of force that Adams has presented, no trier of fact

could reasonably conclude by a preponderance of the evidence that the City of Shreveport breached its duty by failing to provide adequate training to its officers.

With respect to Adams' theory based on a lack of training for dealing with EDP's, the same lack of evidence of causation that was fatal to Adams' <u>Monell</u> claim on this theory is also fatal to Adams' negligent hiring, training, and/or supervision claim on this theory. Because Officers Coleman and Neville had no knowledge of any facts indicating that Adams was an EDP, they would have had no basis for using any specialized training in dealing with EDP's even if they had any training of this kind. Thus, Adams' negligent hiring, training, and/or supervision claim on this theory must also be dismissed.

**CONCLUSION**

Defendants' Motion for Partial Summary Judgment (Record Document 21) is hereby **GRANTED IN PART** and **DENIED IN PART**. Because Defendants' Motion technically seeks dismissal of all of Adams' claims with the exception of his excessive force claims against Officer Coleman but fails to address the similar assault and battery claims against Officer Coleman under state law, the Motion is **DENIED** with respect to those claims. In all other respects, Defendants' Motion is **GRANTED**.

Thus, the final disposition of Adams' claims in the instant Memorandum Ruling is as follows:

1) Adams' § 1983 claim for excessive force against Officer Coleman and his state law claims for excessive force, assault, and battery against Officer Coleman survive summary judgment;

2) All of Adams' other § 1983 claims (including all official capacity claims against Officers Coleman and Neville) are **DISMISSED WITH PREJUDICE**.

3) Adams' state law claims for false arrest, false imprisonment, and malicious prosecution, against all Defendants and his negligent hiring, training, and/or supervision against the City of Shreveport are **DISMISSED WITH PREJUDICE**.

4) The Court makes the preliminary finding that there is no genuine dispute of material fact on Adams' state law claims for excessive force, assault, and battery against Officer Neville.

If Adams wishes to oppose summary judgment on the basis that there is a genuine dispute of material fact on his state law claims for excessive force, assault, and battery against Officer Neville, he is **ORDERED** to respond with (1) a memorandum not to exceed ten pages addressing solely these issues; and (2) any summary judgment evidence in support, within fourteen days of the instant Memorandum Ruling and Order. Absent such a response, the Court will render judgment in favor of Defendants on these three claims. The deadline for Defendants to respond to such a memorandum and supporting evidence, if any, shall be seven days after Adams' filing. Defendants' response may not exceed ten pages, and Defendants may attach additional evidence in support of their contentions. An Order consistent with the terms of the instant Memorandum Ruling will issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, on this the 28th day of August, 2017.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE